The following appeal emanates from the decision of the Mahoning County Court of Common Pleas, Juvenile Division, wherein the court found Walter Turchyn and Laura J. Cornelius to be in contempt for their failure to submit to court ordered genetic testing. For the reasons set forth below, the decision of the trial court is affirmed.
 I. FACTS
The case at bar springs from a written agreement subscribed to on May 26, 1995 by two married couples, Laura J. and Richard A. Cornelius and Walter S. and Kimberly B. Turchyn. Pursuant to the agreement, the couples were to enter into a surrogate parenting arrangement for the benefit of the Turchyns. Due to the fact that Mrs. Turchyn could no longer have children and the Turchyns wished to add a fourth child to their family, the couples agreed to have Mrs. Cornelius act as a surrogate mother. It was agreed that Mrs. Cornelius would be inseminated with Mr. Turchyn's sperm by means of a procedure conducted at one of the party's homes. While said procedure did not involve any sexual contact, it was not performed by a medical professional. Under the terms of the agreement, Mrs. Cornelius' services were to be purely gratuitous and the child would be delivered to the Turchyns upon its birth. However, the agreement contained an additional provision which permitted Mrs. Cornelius to decide to keep the child so long as this decision was made prior to the time of birth and said decision was conveyed to the Turchyns. Prior to the birth of the child, Laura and Richard Cornelius decided that they did not wish to give up custody so they informed the Turchyns of such. The child was born in February of 1996 after which time the Turchyns were never provided the opportunity to visit with the newborn.
As a result of being denied custody as well as visitation of the child, Walter Turchyn filed a complaint on May 13, 1996 in the Mahoning County Court of Common Pleas, Juvenile Division. Pursuant to the complaint, Mr. Turchyn requested that the court order genetic testing in an attempt to determine whether he could establish a parent/child relationship. In Mrs. Cornelius' May 23, 1996 answer to the complaint, it was alleged that Ohio's statutory framework barred Mr. Turchyn from bringing an action to determine the existence of a parent/child relationship. A hearing was first held on Mr. Turchyn's request for genetic testing on June 13, 1996. During the course of the hearing testimony elicited from the parties established that while the parties willingly entered into the agreement, Mrs. Cornelius decided to keep the child prior to its birth. The position was again proposed by Mrs. Cornelius that Mr. Turchyn was barred from seeking to establish a parent/child relationship. Mr. Turchyn responded that despite the seeming complexity of the situation, the trial court was merely being presented with a pure paternity action. It was the trial court's decision to appoint a guardianad litem for the child and to continue the matter for further proceedings.
On July 31, 1996 a second hearing was held by the trial court which was conducted as a status conference. Both parties, as well as the guardian ad litem, were advised to prepare briefs relating to the issue of the power of the court to order genetic testing. While the guardian ad litem and Mrs. Cornelius complied with this request, Mr. Turchyn chose instead to file a motion to dismiss pursuant to Civ.R. 41. Mr. Turchyn cited as the basis for this request his desire to spare the minor child the difficulty of possibly splitting his time between two families.
Having received the motions regarding genetic testing as well as Mr. Turchyn's motion to dismiss, the trial court held a hearing on October 31, 1996 for disposition of these matters. In the court's December 12, 1996 judgment entry, it was determined that the complaint would not be dismissed as requested by Mr. Turchyn. While he was in fact the party which filed the complaint originally, the trial court held that the best interest of the child required the paternity action to continue despite Mr. Turchyn's wishes to the contrary. Additionally, the trial court found that the relevant statutory sections did not preclude genetic testing and rather such was in the best interest of the child. However, prior to ordering genetic testing, the trial court indicated that a necessary party to the action must be joined, said party being Richard Cornelius, the husband of the purported surrogate mother.
Subsequent to Mr. Cornelius being added to the pleadings, the trial court held another hearing on March 19, 1997. At that time, the trial court officially ordered Mr. Turchyn, Mrs. Cornelius and the child to submit to genetic testing on April 29, 1997. The court expressed its intention to set the matter for a pre-trial once test results were received. While Mrs. Cornelius filed an appeal from this decision with this court, said appeal was dismissed due to the lack of a final appealable order.
Following the dismissal of the appeal, the trial court again ordered the parties to submit to genetic testing. However, none of the parties appeared on the date scheduled for the testing. As a result, the trial court ordered Mr. Turchyn and Mrs. Cornelius to appear on April 13, 1998 and show cause as to why they should not be held in contempt. While Mr. Turchyn appeared pro se at the scheduled contempt hearing, Mrs. Cornelius failed to appear despite having received proper notice. Finding that both parties failed to show cause, the trial court found both Mr. Turchyn and Mrs. Cornelius in contempt. Each party was sentenced to five days in jail and was required to pay a fine of $250 plus costs. It is from this decision that Mrs. Cornelius, appellant herein, filed the instant appeal on April 23, 1998.
Appellant asserts a single assignment of error on appeal.
 II. ASSIGNMENT OF ERROR
Appellant cites as her sole assignment of error, the following:
 "THE TRIAL COURT COMMITTED ERROR IN HOLDING THAT OHIO REVISED CODE 3111.37 (A) DOES NOT APPLY TO A SURROGATE MOTHER WHO IS ARTIFICIALLY INSEMINATED AND IN ORDERING THE PARTIES TO HAVE GENETIC TESTING AND FINDING THEM IN CONTEMPT OF COURT FOR FAILURE TO APPEAR, WITH A FIVE (5) DAY JAIL SENTENCE AND A TWO HUNDRED FIFTY DOLLAR ($250.00) FINE."
As has been the norm throughout the proceedings in this case at the trial court level, appellant insists that R.C. 3111.37 (A) prevents the trial court from ordering genetic testing in an attempt to determine the existence of a parent/child relationship. It is the position of appellant that pursuant to the statute, the husband of appellant, Laura J. Cornelius, has conclusively been determined to be the natural father of the newborn child and steps cannot be taken to affect this relationship. The basis for this conclusion is the contention of appellant that R.C. 3111.37 (A) is directly applicable as Laura is a married woman who was the subject of a non-spousal artificial insemination to which her husband consented. Appellant is of the belief that the trial court "ignored entirely the applicability of Ohio Revised Code 3111.37 (A)."
It should be noted that from the outset of the brief of appellant, it is submitted that the Ohio Revised Code is the only legal authority governing the present factual situation. A review of Ohio case law brings this court to a similar conclusion that the factual scenario presented in the case sub judice has not previously been addressed by Ohio appellate courts.
As previously stated, it is the belief of appellant that the dictates of R.C. 3111.37 (A) must lead this court to the conclusion that the trial court erred in ordering genetic testing. This statute reads as follows:
 "If a married woman is the subject of a non-spousal artificial insemination and if her husband consented to the artificial insemination, the husband shall be treated in law and regarded as the natural father of a child conceived as a result of the artificial insemination, and a child so conceived shall be treated in law and regarded as the natural child of the husband. A presumption that arises under division (A) (1) or (2) of section 3111.03 of the Revised Code is conclusive with respect to this father and child relationship, and no action under sections 3111.01 to 3111.19 of the Revised Code shall affect the relationship."
Despite appellant's contention as to the statute's applicability, the trial court correctly found that appellant's reliance was misplaced. While at first blush it may appear the statute precludes genetic testing which may affect the father/child relationship, the trial court properly referenced two factors which make the statute inapplicable to the case at bar.
First, the underlying facts in the present case do not establish an instance of artificial insemination as contemplated in R.C. 3111.30 et seq. While it is true that appellant was impregnated through means other than direct sexual contact, the relevant statutory language creates certain procedural safeguards which must be met in order for a procedure to qualify as "artificial insemination." For instance, R.C. 3111.35 (A) (1) (f) mandates that the sperm donor in a non-spousal artificial insemination scenario remains anonymous. Additionally, R.C.3111.32 indicates that a non-spousal artificial inseminationshall be performed by a physician or a person under the supervision of a physician. Moreover, the physician is subject to follow numerous procedures as set forth under R.C. 3111.35 (A).
A review of the record reveals that none of these procedural safeguards were followed so as to gain the benefit of R.C.3111.37 (A). It certainly cannot be said that the donor was anonymous in this case. By the parties' own admissions, they had been acquainted for several years and had discussed the surrogate arrangement on multiple occasions. This procedural safeguard is most closely tied to the triggering of R.C. 3111.37 (A). In the case of a non-spousal artificial insemination where the donor is not known, the legislature has provided under this statute that paternity cannot be contested for public policy reasons. For instance, in the event the parents of a child conceived through anonymous, non-spousal artificial insemination were to request a divorce, paternity testing would have the consequence of illegitimizing the child. Since the sperm donor is unknown, paternity testing would result in the child being fatherless. However, such is not the case presently when dealing with individuals who have not protected the anonymity of the donor. Paternity testing in the case at bar does not bastardize the child but instead assures that the child will know his natural father.
In addition to the failure to maintain the donor's anonymity, the parties in the case at bar did not utilize the services of a physician as required by R.C. 3111.35. Similarly, they did not follow the procedural safeguards set forth in the statute. Therefore, appellants clearly did not create a situation which was within the expectations established by the legislature as to non-spousal artificial insemination. A similar result was reached in the case of C.O. v. W.S. (C.P. 1994), 64 Ohio Misc.2d 9 when the Cuyahoga County Juvenile Court determined a mother could not utilize R.C. 3111.37 when she did not comply with the medical or anonymity requirements set forth in R.C. 3111.30 et seq. Although appellant indicates that R.C. 3111.37 (A) is the only statute dealing with artificial insemination, R.C. 3111.30 et seq. all apply to artificial insemination and must be read in parimateria.
The second and possibly more persuasive factor discussed by the trial court as to the inapplicability of R.C. 3111.37 (A) is that which is set forth in R.C. 3111.31. This statute states as follows:
 "Sections 3111.30 to 3111.38 of the Revised Code deal with non-spousal artificial insemination for the purpose of impregnating a woman so that she can bear a child that she intends to raise as her child. These sections do not deal with artificial insemination of a wife with the semen of her husband or with surrogate motherhood." (Emphasis added)
As can be deduced from the clear language used by the legislature, this statute is fatal to the argument of appellant for two reasons. First, the statute indicates that R.C. 3111.37
is not applicable to surrogate motherhood situations. This statement in and of itself destroys the reliance of appellant on the statute for the proposition that genetic testing cannot be ordered as appellant's husband is conclusively presumed to be the natural father. Furthermore, said appellant did not intend to keep the child at the time she was impregnated. This provides a second basis for holding that R.C. 3111.37 (A) in inapplicable to the case at bar. While appellant contends that the trial court "ignored entirely the applicability of Ohio Revised Code 3111.37
(A)," such was not the case. The trial court reviewed this section of the statute and properly reasoned it was not applicable due to reasons similar to those set forth by this court.
Having determined that the trial court correctly found R.C.3111.37 (A) inapplicable to the present case, we must now analyze whether the court erred in ordering genetic testing to determine the existence or nonexistence of a father/child relationship over the objection of the putative father and the natural married mother.
This action was originally brought by Walter Turchyn pursuant to R.C. 3111.04 in an attempt to determine the existence of a father/child relationship. This statute states in pertinent part:
 "(A) An action to determine the existence or nonexistence of the father and child relationship may be brought by the child or the child's personal representative * * * [or] a man alleged or alleging himself to be the child's father * * *."
As part of Mr. Turchyn's motion, a request for genetic testing was made pursuant to R.C. 3111.09. While Mr. Turchyn subsequently attempted to dismiss his complaint, the trial court properly determined on December 12, 1996 that the action should not be dismissed. In relying upon the Ohio Supreme Court's decision inState ex rel. Fowler v. Smith (1994), 68 Ohio St.3d 357, the trial court found that the best interest of the child required the court to maintain discretion in granting or denying dismissals relating to paternity actions. Such a holding is supported by the reality that often times the best interest of the child may be in conflict with the father's interest.
Having decided to proceed with the paternity action, the trial court was faced with the presumption that appellant's husband was the natural father of the child. R.C. 3111.03 (A) (1). However, said presumption could be overcome "by clear and convincing evidence that includes the results of genetic testing." R.C.3111.03 (B)(1). Furthermore, the trial court is granted authority to order genetic testing pursuant to R.C. 3111.09 (A) (1) upon its own motion or upon the motion of any party to the action.
Prior to making a final decision as to genetic testing, the trial court ordered all parties to file briefs on the issue. According to the trial court's December 12, 1996 entry, said briefs were considered in its final determination to order genetic testing. In finding that the best interest of the child was served by ordering genetic testing, reliance was placed on the statements of the child's guardian ad litem. In particular, the child had an interest in having certainty as to his biological heritage despite the unusual circumstances created by the parties. Additionally, he was entitled to his natural father's care and guidance. As the guardian ad litem indicated in her brief, the child is statutorily entitled to his father's financial support and to inherit from his natural father's estate. The only sure way to protect these interests is to order genetic testing and determine paternity. While appellant may believe it would be easier on the families to avoid genetic testing, the interest sought to be protected is ultimately the child's. As such, the trial court was well within its discretion to order all parties to submit to genetic testing.
Having lawfully ordered genetic testing, the trial court was permitted to find the parties in contempt for failing to comply. A common pleas court has the authority pursuant to R.C. 2705.02
(A) to hold an individual in contempt for disobeying the command of the court as set forth in its entry or judgment. Additionally, the Ohio Supreme Court has consistently held that a court has inherent authority to punish contemptuous conduct. Burt v. Dodge
(1992), 65 Ohio St.3d 34, 35; Zakany v. Zakany (1984), 9 Ohio St.3d 192,194. Such proceedings are permitted in order to uphold the effective administration of justice and secure the dignity of the court. Cramer v. Petrie (1994), 70 Ohio St.3d 131, 133. Therefore, the trial court in the case sub judice was within its discretion to find appellant, Laura J. Cornelius, in contempt as a direct result of her disobedience of the court's prior order. The assignment of error, therefore, is determined to lack merit.
For the foregoing reasons, the judgment of the trial court is affirmed.
Cox, P.J., concurs.
Waite, J., concurs.
APPROVED:
 ______________________________ JOSEPH J. VUKOVICH, JUDGE